FILED
2026 Mar-05 PM 04:17
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

VEGAS WHITE-WILSON, as the personal representative of the estate of her son, Taurus White,

Plaintiff

v.

JOHN HAMM,
GREGORY LOVELACE,
WENDY WILLIAMS,
LAGRETA MCCLAIN,
CHADWICK CRABTREE,
WILLIAM STREETER,
DENICE MCKENZIE,
RYAN WALLIS,
SHANNON CALDWELL,
JEREMY PELZER,
_____ COLLINS,
_____ MITCHELL,
STEVEN[1] PARKER, and
_____ BISHOP,

Defendants.

CASE NO. __________

**Jury Trial Demanded**

**COMPLAINT**

Plaintiff complains of defendants, stating as follows:

**Nature of the Action**

1. This is a civil action brought by plaintiff, as the personal representative of the estate of her son, Taurus White, who was an inmate at Limestone Correctional

[1] Plaintiff believes this is the likely first name of the correctional officer involved.

Facility, against various ADOC officials for violating White's Eighth Amendment rights. White was stabbed to death in front of multiple corrections officers, all of whom, despite an opportunity to save White's life, instead just watched him being murdered without lifting a finger. This murder was part of a long-standing pattern of inmate-on-inmate violence at Limestone and throughout the Alabama prison system. Accordingly, this suit is being brought not only against the officers who let White be murdered, but also against Limestone wardens and supervisors and ADOC upper management personnel who failed to take reasonable steps to address the violence and the conditions that continue to perpetuate it.

## Jurisdiction and Venue

2. This action arises under the Eighth Amendment to the United States Constitution, 42 U.S.C. § 1983. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3. This judicial district is an appropriate venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.

## Parties

4. Vegas White-Wilson is of legal age and a citizen and resident of the state of Alabama. She is the duly appointed representative of the estate of her son, Taurus

White.

5. Defendant John Hamm is over the age of nineteen, and he is the Commissioner of the ADOC, the state agency that administers the prison system in Alabama. He has held that position since January 1, 2022, and he held that position at all times relevant to this Complaint. As Commissioner, Defendant Hamm is the highest-ranking official in the ADOC, and he is responsible for the direction, supervision, and control of the ADOC and its employees. Defendant Hamm personally supervises the activities of the ADOC, and he is responsible for ensuring that ADOC employees are properly trained and properly carrying out their assigned duties. He is responsible for setting the department-wide policies and customs of the ADOC; overseeing institutional policies and customs at ADOC facilities; supervising and approving the adoption of changes in departmental and institutional policies and customs; and planning, directing, controlling, and otherwise managing ADOC facilities to ensure the safety and security of all ADOC prisoners. He has the duty, ability, and authority to suggest or require modifications to departmental and institutional policies and practices and to implement or supervise the implementation of such modifications as necessary. As Commissioner, Defendant Hamm is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

6. Defendant Gregory Lovelace is over the age of nineteen, and he is the Chief Deputy Commissioner of Corrections of the ADOC. He has held that position since in or about May 2022, and he held that position at all times relevant to this Complaint. As Chief Deputy Commissioner, Defendant Lovelace manages and oversees all operations and administrative divisions of the ADOC and its facilities. Defendant Lovelace is responsible for implementing the rules, regulations, procedures, and standards governing the administration of the ADOC and for ensuring the effective and safe daily operations of all ADOC facilities. He has the duty, ability, and authority to suggest or require modifications to departmental and institutional policies and practices and to implement or supervise the implementation of such modifications as necessary. As Chief Deputy Commissioner, Defendant Lovelace is a final policymaker for the Department and has a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. He is sued in his individual capacity.

7. Defendant Wendy Williams is over the age of nineteen, and she was the Deputy Commissioner of Men's Services for the ADOC at all times relevant to this Complaint. She held that position from in or about January 2022 through in or about September 2024. As Deputy Commissioner, Defendant Williams reported directly to Defendants Hamm and Lovelace, and she was the point person on the Department's administrative team regarding institutional security issues, including all incidents of

inmate-on-inmate violence and sexual assault. Defendant Williams oversaw all aspects of institutional security at the facilities under her supervision, including Limestone, and she was responsible for ensuring the effective and safe daily operations of those facilities. Defendant Williams's oversight included: reviewing facility policies and practices related to inmate classification, housing, and transfer; reviewing facility incident reports and investigations related to inmate extortion, violence, physical assault, sexual assault, and contraband confiscation; reviewing internal audit reports; reviewing PREA audit reports; reviewing facility staffing plans and overseeing facility staffing; reviewing personnel training records and practices; and supervising and monitoring facility leadership to ensure compliance with all directions, regulations, and policies. Defendant Williams was responsible for addressing violations of institutional policies and procedures, and she had the duty, ability, and authority to suggest or require modifications to those policies and procedures and to implement or supervise the implementation of such modifications as necessary. As Deputy Commissioner, Defendant Williams was a final policymaker for facilities under her supervision and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of the ADOC. She is sued in her individual capacity.

8. Defendant Lagreta McClain is over the age of nineteen, and she is a

Regional Director for the ADOC. At all times relevant to this Complaint, Defendant McClain was the Regional Director over Limestone, and she reported directly to Defendant Williams. As Regional Director, Defendant McClain was responsible for planning, monitoring, and reviewing the day-to-day operations of the facilities in her assigned area, including Limestone. Her duties included supervising wardens; serving as a liaison between facilities and ADOC executive leadership; ensuring safe conditions at the facilities within her region; and leading the external security audit team. Defendant McClain maintained frequent contact with the wardens of all facilities within her region, including the wardens at Limestone. She also received daily or near-daily reports from the facilities within her region; was notified of all urgent and emergent incidents, including fights with a weapon, fights causing serious injuries, sexual assaults, overdoses, and contraband confiscations; and she received and reviewed staffing reports and audit reports, including PREA audit reports, and suggested corrective action reports. As Regional Director, Defendant McClain was a final policymaker for the facilities under her supervision and had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of those facilities. She is sued in her individual capacity.

9. Collectively, Defendants Hamm, Lovelace, Williams, and McClain are referred to as the "Defendant Administrative Supervisors."

10. Defendant Chadwick Crabtree is over the age of nineteen and was the Correctional Warden III ("CWIII"), the head warden, of Limestone at all times relevant to this Complaint. As CWIII, Defendant Crabtree reported directly to Defendant McClain. He was responsible for all day-to-day operations of Limestone; the safety and security of all prisoners there; and the supervision, discipline, and training of all Limestone employees. He was responsible for ensuring adequate supervision and monitoring of prisoners; adequate classification of prisoners; appropriate housing assignments for prisoners; adequate correctional staffing levels; appropriate discipline and deterrence of prisoner and staff misconduct; adequate implementation of internal security audits; and proper installation, repair, maintenance, and monitoring of locks, cameras, and other devices necessary for the safety and security of inmates and staff at Limestone; as well as institutional compliance with all relevant requirements of the Prison Rape Elimination Act of 2003 ("PREA").

11. As CWIII, Defendant Crabtree created, reviewed, revised, and approved all the standard operating procedures ("SOPs") at Limestone; reviewed and approved all proposed staffing plans; and managed, monitored, and supervised the operations and personnel at Limestone to ensure that all critical posts were filled and all essential functions were completed. He reviewed incident reports, shift officer reports, and

inmate disciplinary reports. He also remained aware of trends at Limestone, including those related to inmate population and staffing levels; the frequency and severity of inmate-on-inmate extortion, physical assault, and sexual assault; and the prevalence of weapons, drugs, electronics, and other contraband. As CWIII, Defendant Crabtree was a final policymaker for Limestone and had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

12. Defendant William Streeter is over the age of nineteen and was the Correctional Warden II ("CWII") at Limestone at all times relevant to this Complaint. As CWII, Defendant Streeter reported directly to Defendant Crabtree. He was responsible for day-to-day operations of Limestone; the safety and security of prisoners there; and the supervision, discipline, and training of all subordinate employees. He oversaw institutional activities at Limestone; managed captains, lieutenants, and other subordinate correctional staff; conducted and assisted in conducting institutional inspections; reviewed and approved incident reports, shift officer reports, and inmate disciplinary reports; and assisted in ensuring the safety and security of inmates and staff at Limestone. He remained aware of trends at Limestone related to inmate population and staffing levels; the frequency and severity of inmate-on-inmate extortion, physical assault, and sexual assault; and the prevalence

of weapons, drugs, electronics, and other contraband. As CWII, Defendant Streeter had a duty to exercise ordinary and reasonable care for the protection of all people incarcerated there. He is sued in his individual capacity.

13. Defendant Denice McKenzie is over the age of nineteen and was a Correctional Captain at Limestone at all times relevant to this Complaint. As Captain, Defendant McKenzie was responsible for the safety and security of prisoners at Limestone; monitoring prisoners, prisoner housing units, and security activities; addressing and investigating inmate reports of extortion, threats, and physical and sexual assault; and supervising, training, and disciplining subordinate staff. Defendant McKenzie oversaw institutional operations at Limestone and reviewed subordinates' shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff were fulfilling their job responsibilities. As Captain, Defendant McKenzie had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. She is sued in her individual capacity.

14. Defendant Ryan Wallis is over the age of nineteen and was a Correctional Captain at Limestone at all times relevant to this Complaint. As Captain, Defendant Wallis was responsible for the safety and security of prisoners at Limestone; monitoring prisoners, prisoner housing units, and security activities;

addressing and investigating inmate reports of extortion, threats, and physical and sexual assault; and supervising, training, and disciplining subordinate staff. Defendant Wallis oversaw institutional operations at Limestone and reviewed subordinates' shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff were fulfilling their job responsibilities. As Captain, Defendant Wallis had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

15. Defendant Shannon Caldwell is over the age of nineteen and was a Correctional Captain at Limestone at all times relevant to this Complaint. As Captain, Defendant Caldwell was responsible for the safety and security of prisoners at Limestone; monitoring prisoners, prisoner housing units, and security activities; addressing and investigating inmate reports of extortion, threats, and physical and sexual assault; and supervising, training, and disciplining subordinate staff. Defendant Caldwell oversaw institutional operations at Limestone and reviewed subordinates' shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff were fulfilling their job responsibilities. As Captain, Defendant Caldwell had a duty to exercise ordinary and reasonable care for the protection of all people in the custody

of Limestone. He is sued in his individual capacity.

16. Defendant Jeremy Pelzer is over the age of nineteen and was a Correctional Lieutenant at Limestone at all times relevant to this Complaint. As Lieutenant, Defendant Pelzer was responsible for the safety and security of prisoners at Limestone; monitoring prisoners, prisoner housing units, and security activities; addressing and investigating inmate reports of extortion, threats, and physical and sexual assault; and supervising, training, and disciplining subordinate staff. Defendant Pelzer oversaw institutional operations at Limestone and reviewed subordinates' shift logs, duty post logs, and other mandated paperwork to ensure that facility operations were being conducted as required and that subordinate staff were fulfilling their job responsibilities. As Lieutenant, Defendant Pelzer had a duty to exercise ordinary and reasonable care for the protection of all people in the custody of Limestone. He is sued in his individual capacity.

17. Collectively, Defendants Crabtree, Streeter, McKenzie, Wallis, Caldwell, and Pelzer are referred to as the "Defendant Facility Supervisors."

18. Defendant _____ Collins was a correctional officer at Limestone Correctional Facility at all relevant times.

19. Defendant _____ Mitchell (female) was a correctional officer at Limestone Correctional Facility at all relevant times.

20. Defendant Steven Parker was a correctional officer at Limestone Correctional Facility at all relevant times.

21. Defendant _____ Bishop was a correctional officer at Limestone Correctional Facility at all relevant times.

22. Collectively, Defendants Collins, Mitchell, Parker and Bishop are referred to as the "Defendant Corrections Officers."

23. All defendants are sued in their individual capacities only.

## FACTS

### White Is Stabbed to Death One Month Prior to His Expected Release Date

24. White was serving a four-year sentence and was expected to be released on or about April 6, 2024.

25. In 2023 and into early 2024, Taurus White was housed in a dorm at Limestone used to handle inmates that were not considered dangerous. Plaintiff is unsure of White's exact custody level.

26. In February 2024, as White approached his release date, White was moved to North Alabama Community Work Center, a minimum-custody facility in Morgan County.

27. In early March 2024, for unknown reasons, White was moved back to Limestone.

28. Instead of being placed back in the same dorm or in the pre-release dorm (for inmates who are approaching their release date), White was placed in a dorm for violent and dangerous inmates, most of whom were under lengthy sentences, with security and custody levels higher than White's.

29. Shortly after returning to Limestone, on or about March 5, 2024, White was violently attacked by multiple inmates while in line to purchase items from the canteen/store.

30. At least two of the inmates were armed with knives.

31. Nearby were multiple corrections officers, including the Defendant Corrections Officers.

32. The Defendant Corrections Officers did not intervene. Instead, they just watched.

33. The Defendant Corrections Officers could have prevented White's death if they had acted rather than watched.

34. Limestone is Alabama's largest prison. It is also a security level five, or "maximum security," facility-the highest security level possible for an Alabama prison. As a result, Limestone houses some of Alabama's most violent and dangerous offenders.

35. Incredibly, only a few days earlier, on or about February 29, 2024, a

minimum custody inmate (Sean Towles) was abducted and beaten and raped by four inmates, at least two of whom had knives. Towles cried for help and was heard and observed by one or more corrections officers, who did nothing. [*See Towles v. Hamm*, No. 5:26-cv-333-HDM, Doc. 1 ¶¶26-34]

**Violence in Alabama's Prisons is Severe and Pervasive**

36. Incidents like the stabbing death of White and the beating and rape of Towles are disturbingly common in Alabama's prisons.

37. Conditions inside Alabama's prisons have historically been among the worst in the nation. The prisons are overcrowded, understaffed, and saturated with drugs and weapons. Inmate-on-inmate assaults are commonplace, and prisoners live under the near-constant threat of assault and victimization by other inmates.

38. In October 2016, the U.S. Department of Justice ("DOJ") opened a statewide investigation into the conditions of Alabama's prisons for men. The investigation focused on whether prisoners are adequately protected from physical harm and sexual abuse by other prisoners; whether prisoners are adequately protected from excessive force and sexual abuse by guards; and whether the prisons provide safe, sanitary, and secure living conditions. [Press Release, U.S. Dep't of Justice, Justice Department Announces Statewide Investigation into Conditions in Alabama's Prisons for Men 1 n.2 (Oct. 6, 2016), available at

*https://www.justice.gov/usao-mdal/pr/justice-department-announces-statewide-investigation-conditions-alabama-s-prisons-men*]

39. The DOJ published the report of its investigation in April 2019. [Press Release, U.S. Dep't of Justice, Justice Department Alleges Conditions in Alabama Men's Prisons Violate the Constitution (April 3, 2019), available at *https://www.justice.gov/opa/pr/justice-department-alleges-conditions-alabama-mens-prisons-violate-constitution*; Letter from the U.S. Dep't of Justice, Notice Regarding Investigation of Alabama's State Prisons for Men (April 2, 2019), available at *https://www.justice.gov/opa/press-release/file/1150276/download* ("April 2019 Report")]

40. The DOJ concluded that reasonable cause existed to believe that "Alabama routinely violates the constitutional rights of prisoners housed in the Alabama's prisons [sic] by failing to protect them from prisoner-on-prisoner violence and prisoner-on-prisoner sexual abuse, and by failing to provide safe conditions," and that the violations "are exacerbated by serious deficiencies in staffing and supervision and overcrowding." [*Id.* at 1]

41. The DOJ's investigation "revealed that an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis." [*Id.* at 2]

42. The DOJ's investigation revealed that violence is common, severe, and widespread throughout Alabama's prisons for men, amounting to "a pattern of undeterred systemic" inmate-on-inmate abuse. [*Id.* at 35]

43. At the time of the DOJ's investigation, Alabama's prisons had the highest homicide rate in the country. The 2017 homicide rate in the ADOC was 56 per 100,000 prisoners–approximately eight times the 2014 national average homicide rate of 7 per 100,000 prisoners.

44. That homicide rate has since gone up. In 2022, there were at least eighteen homicides across all ADOC facilities, which housed approximately 19,978 prisoners. That corresponds to a homicide rate of 90 per 100,000 prisoners–more than seven times the 2019 national average homicide rate for state prisoners of 12 per 100,000 prisoners. In 2023, the homicide rate within the ADOC increased to 92.5 homicides per 100,000 prisoners.

45. The overall death rate in Alabama's prisons is also well above the national average. In 2019, the national average overall mortality rate for state prisoners was 330 per 100,000 prisoners. In 2022, the ADOC reported 266 total deaths across its prisons-a mortality rate of 1,330 per 100,000 prisoners, or nearly five times the 2019 national average. In 2023, the total deaths within the ADOC had risen to 325, corresponding to a mortality rate of 1,596 deaths per 100,000 prisoners.

**The Widespread History of Unconstitutional Conditions at Limestone**

46. The dangerous conditions described above were especially prevalent at Limestone.

47. Limestone is a Level V (or "close custody") facility–the highest security level an Alabama prison can have. Level V facilities are designed to house some of the most dangerous prisoners: close custody inmates, inmates sentenced to life without parole, and medium custody inmates that require additional security.

48. Not only does Limestone house some of Alabama's most dangerous offenders, but these offenders are packed tightly together. For the 2022 calendar year, Limestone operated at more than 140% capacity: it had an average monthly population of 2,288 inmates in a facility designed to house 1,628 inmates. For the 2023 calendar year, Limestone's average monthly population rose to 2,350, meaning that it operated at more than 144% capacity that year.

49. Limestone was also a dangerous facility: deaths, assaults, drugs, and weapons were common.

50. For the 2022 calendar year, the ADOC reported a total of 237 assaults at Limestone, including 179 inmate-on-inmate assaults and seventy inmate-on-inmate fights.

51. For the 2024 fiscal year (August 2023 - August 2024), the ADOC

reported 208 total assaults at Limestone, including 139 inmate-on-inmate assaults and 99 inmate-on-inmate fights.

52. Weapons and drugs were everywhere in Limestone. For the 2022 calendar year, the ADOC reported confiscating 381 weapons and 7,811.97 grams of drugs at Limestone alone. By the end of May 2023, it had already confiscated 420 weapons and 5,999.86 grams of drugs there.

**Additional Unconstitutional Conditions Contribute to the High Incidence of Violence in Alabama's Prisons**

53. Numerous conditions within Alabama's prisons for men contribute to the high incidence of prisoner-on-prisoner sexual violence within the ADOC. These conditions-which include understaffing, overcrowding, and easy access to drugs and weapons-are longstanding and widespread.

*Understaffing and Overcrowding*

54. The DOJ reported that the "staggering staffing deficiencies" throughout the ADOC exacerbate the unconstitutionally high level of sexual abuse in Alabama's prisons. [*Id.* at 50]

55. The ADOC's staffing deficiencies have been the subject of numerous lawsuits, legislative hearings, and news reports, and the ADOC has been under court order for years to increase its staffing levels. Those levels nevertheless remain abysmal.

56. In February 2018, a federal court held that the "lack of correctional staff leaves many ADOC facilities incredibly dangerous and out of control and causes prisoners and correctional officers alike to be justifiably afraid for their safety." *Braggs v. Dunn*, No. 2:14-cv-601-MHT, 2018 U.S. Dist. LEXIS 26338, at *14 (M.D. Ala. Feb. 20, 2018) (internal quotation marks omitted). The court ordered the ADOC to increase the correctional-staffing levels inside its male prisons.

57. At the time of the court's order, Alabama's male facilities were operating, on average, with only 42.5% of the guards they needed: 3,361 full-time guards were required to operate the prisons safely, but the ADOC only employed 1,431 full-time guards.

58. In the years leading up to White's murder and Towles' assault and rapes, staffing levels in the ADOC were even worse. Staffing levels during 2022 and 2023 never reached 40%. In early 2024, ADOC barely hit 40%. The staffing levels at Limestone were only slightly better during that time and never hit 50%.

59. As the DOJ's investigation found, "[s]taffing ratios are so low in some dormitories that ADOC is essentially providing no security for prisoners." [*Id.* at 36]

60. Making circumstances even more perilous, Alabama's prisons are extraordinarily overcrowded. Overcrowding further amplifies the dangers already inherent in a prison environment, including the danger of being assaulted or sexually

victimized.

61. Alabama, like many states, responded to prison overcrowding by converting common areas into "open dormitories"–large rooms filled with bunk beds packed closely together. These makeshift living arrangements create visibility problems because guards cannot see across the dormitory to monitor all the prisoners. The blind spots created by these layouts means that assaults and sexual abuse can occur undetected throughout the dorm.

62. At the time of the DOJ's investigation, Alabama's prisons for men operated at 165% of their intended capacity, incarcerating 6,445 more people than they were designed to house. This overcrowding has not abated.

63. In 2022, Alabama incarcerated an average of 16,178 individuals within its male facilities. These facilities were designed to imprison 9,585 people–nearly 6,600 people fewer than the ADOC packed into them. In 2022, Alabama's prisons for men thus held 168% of the people they were designed to incarcerate.

64. The numbers in 2023 were similar. The ADOC reported an average population of 16,053 people in its prisons for men–6,468 people more than the facilities were designed to house. In 2023, therefore, Alabama's prisons for men incarcerated 167% of the people those facilities were designed for.

65. And in the first two months of 2024, the ADOC reported an average

population of 16,236 people in its prisons for men–6,651 people more than those facilities were designed for, equating to a population of 169% of the people the prisons were designed to hold.

66. Limestone was similarly overcrowded.

67. Limestone was designed for 1,628 prisoners. In 2022, it held an average of 2,288 people–holding 660 more people than it was designed for and operating at approximately 140% of its intended capacity.

68. In 2023, an average of 2,332 people were incarcerated at Limestone–704 people more than it was intended for–meaning that it operated at approximately 143% of its intended capacity.

69. Limestone's population continued to rise, and in the first two months of 2024, an average of 2,388 people were incarcerated there–760 more than it was designed for, meaning that it operated at approximately 147% of its intended capacity

70. The understaffing and overcrowding throughout Alabama's prisons means that "prisoners are unsupervised and largely left to their own devices." [*Id.* at 47] As a result, inmates are assaulted "in the dormitories, cells, recreation areas, the infirmary, bathrooms, and showers at all hours of the day and night." [*Id.* at 35]

*Easy Access to Drugs and Weapons*

71. Drugs are ubiquitous in Alabama's prisons, and they are one of the main

drivers of prisoner-on-prisoner physical and sexual violence.

72. The DOJ's investigation found drugs, violence, and sexual assault frequently go hand-in-hand because "drug usage leads to drug debts, which leads to violence and sexual abuse when prisoners are unable to pay." [*Id.* at 33]

73. This culture is accepted within Alabama's prisons–by guards and prisoners alike: "[M]any ADOC staff appear to accept the high level of violence and sexual abuse in ADOC as a normal course of business, including acquiescence to the idea that prisoners will be subjected to sexual abuse as a way to pay debts accrued to other prisoners." [*Id.* at 36]

74. Drug trafficking, physical violence, and sexual assault in the ADOC are facilitated by the enormous number of weapons available within the prisons.

75. In 2022, the ADOC reported confiscating 6,289 total weapons from the men's prisons, including sixteen firearms. In 2023, it reported confiscating 4,980 weapons, including eleven firearms. And at Limestone alone, the ADOC reported confiscating 381 weapons in 2022 and 1,394 weapons in 2023.

76. The ADOC's reported numbers only reflect confiscated weapons; the true number of weapons in Alabama's prisons is much higher. During its investigation, the DOJ interviewed an "overwhelming" number of prisoners "who had either been stabbed or who had stabbed another prisoner." [*Id.* at 26] Those prisoners'

reports, as well as "the level and violence and stabbings indicated in ADOC's own incident reports" made clear to the DOJ "that whatever measures are in place to prevent the creation and introduction of weapons [into Alabama's prisons], those measures are failing." [*Id.*]

77. In short, Alabama's prisoners live in unsupervised, overpopulated, drug-saturated dorms brimming with weapons where violence and sexual abuse is common, accepted, and undeterred.

*The Defendants Knew of the Unconstitutional Conditions at Limestone*

78. By virtue of their positions within the ADOC and at Limestone, the defendants knew about the conditions at Limestone, including the widespread assaults, sexual and otherwise, the understaffing and overcrowding, the ubiquity of drugs and weapons, and the resulting risk of harm to Limestone's inmates, including White.

79. It is part of the Defendant Administrative Supervisors' jobs to be aware of trends throughout the ADOC, including assault rates, correctional-staffing and inmate-population rates, and contraband-confiscation rates, as is being aware of those trends at each specific ADOC facility, including Limestone.

80. It is part of the Defendant Facility Supervisors' jobs to be aware of those same trends specific to Limestone, as well as to review reports of assaults and

contraband confiscations occurring at Limestone.

81. At the time of White's murder and Towles' assault and rapes, it was common knowledge among employees at Limestone and throughout the ADOC, including the defendants, that inmates at Limestone experienced an ongoing threat of violence, sexual and otherwise.

82. It was also common knowledge among employees at Limestone and throughout the ADOC, including the defendants, that the combination of understaffing and overcrowding significantly increased violence throughout the ADOC, including at Limestone.

**The Defendants Failed to Respond Reasonably to the Unconstitutional Conditions at Limestone**

83. By virtue of their positions within the ADOC and at Limestone, the defendants had the authority and ability to minimize the unconstitutional risk of harm, including harm from violence, sexual and otherwise, to inmates at Limestone. Nevertheless, the defendants failed to respond reasonably to that risk.

84. The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures at Limestone that would have minimized the violence, sexual assault, and presence of weapons and drugs within Limestone. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

85. The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to both (a) decrease the understaffing at Limestone by making it a more attractive place to work and thus easier to hire correctional staff and (b) increase the supervision of inmates by Limestone's existing guards. These defendants nevertheless failed to implement and/or enforce such policies and procedures.

86. The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to create and enforce policies and procedures that would have decreased the dangerous effects of overcrowding at Limestone. The defendants nevertheless failed to implement and/or enforce such policies and procedures.

87. The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to train and/or discipline Limestone employees in ways that would have (a) increased guards' supervision of inmates, (b) decreased the number of weapons and the amount of drugs present, and (c) decreased the incidence of sexual violence. These defendants nevertheless failed to adequately train and/or discipline Limestone employees.

88. The Defendant Administrative Supervisors and the Defendant Facility Supervisors were all in positions to train and/or discipline Limestone employees in

ways that would have (a) increased guards' awareness of the signs and risks of assault, (b) increased the likelihood that guards would respond appropriately to inmates' reports of violence, and (c) increased the likelihood that inmates' reports of violence would be adequately investigated.

89. The Defendant Corrections Officers, as guards working directly inside Limestone and tasked with monitoring, supervising, and protecting the inmates there, could have decreased the risk of harm to inmates in Limestone, including to Plaintiff, by adequately fulfilling their assigned duties.

90. For example, each of the Defendant Corrections Officers could have increased the supervision of inmates at Limestone simply by maintaining more of a physical presence in the dorms there or by more actively monitoring the dorms' surveillance cameras. The Defendant Corrections Officers nevertheless failed to take these actions.

91. Each of the Defendant Corrections Officers could have decreased the amount of weapons and drugs present within Limestone–and thereby decreased the incidence of violence-by conducting contraband searches as required and confiscating contraband when they discovered it. The Defendant Corrections Officers nevertheless failed to search for or confiscate contraband as their job duties required.

92. Each of Defendant Corrections Officers could also have decreased the

number of physical and sexual assaults within Limestone by consistently disciplining inmates who physically or sexually assault other inmates. The Defendant Corrections Officers nevertheless failed to do so.

**COUNT I**
**Violation of the Eighth Amendment - Failure to Protect**
*Against Defendant Collins, Mitchell, Parker, and Bishop*

93. As explained above, the Defendant Corrections Officers were each responsible for ensuring the safety and security of all prisoners at Limestone, including White. Each of these defendants was therefore obligated to take reasonable actions to prevent White from being assaulted by other inmates, including by intervening to stop the inmates while they were physically assaulting White.

94. The Defendant Corrections Officers each observed White's assault by other inmates, as described more fully above.

95. Each of the Defendant Corrections Officers had the duty, ability, and authority to stop or mitigate inmates from assaulting White.

96. Nevertheless, the Defendant Corrections Officers took no action at all to protect White from harm by these inmates.

97. As a direct and proximate result of these defendants' failure to protect White, White was assaulted and stabbed and killed.

**COUNT II**
**Violation of the Eighth Amendment - Failure to Protect**
*Against the Defendant Corrections Officers*

98. As explained above, the Defendant Corrections Officers were each responsible for ensuring the safety of all prisoners at Limestone, including White.

99. The conditions at Limestone created an environment that posed a substantial risk of serious harm from inmate-on-inmate physical and sexual assault to all inmates there, including White. These conditions are more fully described above and include the: (a) chronic and extreme correctional-staff understaffing; (b) near-total absence of inmate supervision; (c) profound and inhumane prison overcrowding; (d) a pervasive and normalized culture of extortion and violence; (e) ready availability of drugs and weapons; and (f) overall acquiescence of correctional staff to a prison culture characterized by physical and sexual violence.

100. These conditions and the resulting substantial risk of serious harm from inmate-on-inmate physical and sexual assault have been well-documented and widely known for years, including in the years before and during the events that form the basis of this Complaint. The conditions that create this substantial risk of serious harm are so obvious that the risk is readily apparent to any individual inside Limestone, including to the Defendant Corrections Officers.

101. Thus, the Defendant Corrections Officers have known for years about

the conditions that lead to the substantial risk of serious harm from inmate-on-inmate physical and sexual assault to every inmate at Limestone, including to White.

102. The Defendant Corrections Officers, by virtue of their positions, have the duty, ability, and authority to address the conditions that lead to substantial risk of serious harm from inmate-on-inmate physical and sexual assault to every inmate at Limestone, including to White.

103. Nevertheless, the Defendant Corrections Officers, both individually and collectively, failed to take any action to either reduce the circumstances above, or to mitigate the dangerous effects those circumstances have on all inmates at Limestone, including White.

104. The misconduct by the Defendant Corrections Officers described in this Count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm from inmate-on-inmate physical and sexual assault to White, in violation of his constitutional rights.

105. As a direct and proximate result of the misconduct by the Defendant Corrections Officers described in this Count, White was assaulted and stabbed and killed.

## COUNT III
**Violation of the Eighth Amendment - Failure to Protect**
*Against the Defendant Administrative Supervisors*
*and the Defendant Facility Supervisors*

106. As explained above, the Defendant Administrative Supervisors and the Defendant Facility Supervisors were each responsible for ensuring the safety of all prisoners at Limestone, including White.

107. The conditions at Limestone created an environment that posed a substantial risk of serious harm from inmate-on-inmate physical and sexual assault to all inmates there, including White. These conditions are more fully outlined above and they include the: (a) chronic and extreme correctional-staff understaffing; (b) near-total absence of inmate supervision; (c) profound and inhumane prison overcrowding; (d) a pervasive and normalized culture of extortion and violence; (e) ready availability of drugs and weapons; and (f) overall acquiescence of correctional staff to a prison culture characterized by physical and sexual violence.

108. These conditions and the resulting substantial risk of serious harm from inmate-on-inmate physical and sexual assault have been well-documented and widely known for years, including in the years before and during the events that form the basis of this Complaint. The conditions that create this substantial risk of serious harm are so obvious that the risk is readily apparent to any individual inside Limestone, including to the Defendant Administrative Supervisors and the Defendant

Facility Supervisors. Thus, these defendants have known for years about the conditions that lead to the substantial risk of serious harm from inmate-on-inmate physical and sexual assault to every inmate at Limestone, including to White.

109. The Defendant Administrative Supervisors and the Defendant Facility Supervisors, by virtue of their positions, have the duty, ability, and authority to address the conditions that lead to substantial risk of serious harm from inmate-on-inmate physical and sexual assault to every inmate at Limestone, including to White.

110. Nevertheless, the Defendant Administrative Supervisors and the Defendant Facility Supervisors both individually and collectively, failed to take any action to either reduce the circumstances described above or to mitigate the dangerous effects those circumstances have on all inmates at Limestone, including White.

111. The misconduct by the Defendant Administrative Supervisors and the Defendant Facility Supervisors described in this Count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm from inmate-on-inmate physical and sexual assault to White, in violation of his constitutional rights.

112. As a direct and proximate result of the misconduct by the Defendant Administrative Supervisors and the Defendant Facility Supervisors described in this

Count, White was assaulted and stabbed and killed.

**COUNT IV**
**Violation of the Eighth Amendment - Failure to Protect**
**(Supervisory Liability)**
*Against the Defendant Administrative Supervisors*
*and the Defendant Facility Supervisors*

113. As explained above, the Defendant Corrections Officers violated White's clearly established Eighth Amendment rights when they failed to take reasonable action to protect him from a known, substantial risk of serious harm from inmate-on-inmate physical and sexual assault.

114. By virtue of their supervisory positions, the Defendant Administrative Supervisors and the Defendant Facility Supervisors were each responsible for training, disciplining, and/or supervising the Defendant Corrections Officers to ensure that they took reasonable steps to protect inmates at Limestone, including White, from a known, substantial risk of serious harm from inmate-on-inmate physical and sexual assault.

115. Because of their positions within the ADOC, including their duties, responsibilities, ranges of knowledge, and domains of authority, as described more fully and specifically for each of the Defendant Administrative Supervisors and the Defendant Facility Supervisors, each of these defendants knew of the circumstances that led to the Defendant Corrections Officers violating White's clearly established

Eighth Amendment rights.

116. Despite knowing of the circumstances that led to the Defendant Corrections Officers violating White's clearly established Eighth Amendment rights and the resulting need to adequately train, discipline, and/or supervise the Defendant Corrections Officers to ensure that they took reasonable steps to protect inmates at Limestone, including White, from a known, substantial risk of serious harm from inmate-on-inmate physical and sexual assault, the Defendant Administrative Supervisors and the Defendant Facility Supervisors failed to do so.

117. These defendants' failure to train, discipline, and/or supervise the Defendant Corrections Officers resulted in the Defendant Corrections Officers failing to take reasonable steps to protect White from a known, substantial risk of serious harm from inmate-on-inmate physical and sexual assault.

118. The misconduct described in this Count was objectively unreasonable and was undertaken willfully, intentionally, maliciously, and/or with deliberate indifference to the substantial risk of serious harm from inmate-on-inmate physical and sexual assault to White, in violation of his constitutional rights.

119. As a direct and proximate result of the misconduct by the Defendant Administrative Supervisors and the Defendant Facility Supervisors described in this Count, White was assaulted and stabbed and killed.

## COUNT V
## State Law Negligence
*Against All Defendants*

120. As explained above, because of their professional roles, each of the defendants owed a duty to exercise ordinary and reasonable care for the protection of all people incarcerated in Limestone, including White.

121. Each of the defendants breached the standard of care he or she owed to White by failing to take reasonable steps to protect inmates at Limestone, including White, from a known, substantial risk of serious harm from inmate-on-inmate physical and sexual assault.

122. As a direct and proximate result of the defendants' breaches of the duty of care they owed to White, White was assaulted and stabbed and killed.

123. The risks and harms the defendants caused White are within the scope of protection afforded by the duties the defendants owed to White.

## Other Matters

124. All conditions precedent to the bringing of this suit have occurred.

125. The individual defendants acted with malice and/or with reckless indifference to White's constitutional rights.

## Relief Sought

126. As relief, plaintiff seeks the following:

a. That plaintiff be awarded such compensatory damages as a jury shall determine from the evidence plaintiff is entitled to recover;

b. That plaintiff be awarded against the individual defendants such punitive damages as a jury shall determine from the evidence plaintiff is entitled to recover;

c. That plaintiff be awarded prejudgment and postjudgment interest at the highest rates allowed by law;

d. That plaintiff be awarded the costs of this action, reasonable attorney's fees, and reasonable expert witness fees;

e. That plaintiff be awarded appropriate declaratory and injunctive relief; and

f. That plaintiff be awarded such other and further relief to which plaintiff is justly entitled.

**Dated March 5, 2026.**

Respectfully submitted,

s/ Henry F. (Hank) Sherrod III

Henry F. (Hank) Sherrod III
No. ASB-1200-D63H
HENRY F. SHERROD III, P.C.
119 South Court Street
Florence, Alabama 35630
Phone: 256-764-4141
Fax: 877-684-0802
Email: hank@alcivilrights.com

Attorney for Plaintiff

**Jury Demand**

Plaintiff requests a trial by jury.

s/ Henry F. (Hank) Sherrod III
Henry F. (Hank) Sherrod III